## Case No. 16,713.

### UNITED STATES v. WILLIAMS.

[5 Cranch, C. C. 62.] [1]

Circuit Court, District of Columbia. Nov. Term, 1836.

PHYSICIANS — PRACTICING WITHOUT LICENSE — INDICTMENT—EVIDENCE—BOARD OF EXAMINERS —CHARTER OF MEDICAL SOCIETY.

1. In a prosecution for practising in the medical art, and receiving payment therefor, in the District of Columbia, without having first obtained a license from the medical board of examiners of that district, or producing a diploma. the court will not compel a witness to produce the medicine which he received from the defendant.

2. In such a prosecution the court will not permit the United States to examine witnesses as to any specific instances of which previous notice has not been given.

3. The application, by an oculist, of a liquid to the eyes, is not the practice of medicine, but rather of surgery.

4. In such a prosecution. it is competent for the defendant to show that the charter was vacated by nonuser, and that there was no board of examiners de jure.

5. A board of examiners, not elected and continued in being by filling up vacancies, but elected annually, is not a legal board.

6. It is incumbent upon the United States to show that the medical society had a corporate existence at the time when, &c.; that the board of examiners was originally elected by, at least, seven of the members of the society; and that the officers were duly appointed: and that, although the minutes of the proceedings of the society should be lost, the United States must prove their contents, and show that at the time when, &c., there was a competent board of examiners de jure.

7. An information in the nature of a quo warranto will not be issued at the suit of an individual alone, to try the validity of a private corporation. But, upon an indictment for a violation of the charter, the defendant may show that the charter was vacated.

8. A license to practise medicine is not necessary, if there be no board of examiners de jure.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

In this case there were five indictments successively found against the defendant [John Williams]. (1) The first, in general terms, charged that the defendant, on the 15th of December, 1836, at, &c., "did practise, within the county and district aforesaid, in the medical art, and receive payment for his services, without first having obtained a license from the medical board of examiners of the District of Columbia, and without the production of a diploma: against the form of the statute," &c. (2) The second was like the first, excepting that it charged that he received payment for his services, "to wit, the sum of fifty dollars from John Mitchell, and the sum of fifty dollars from Joseph S. Wilson."

The jury were first sworn upon these two indictments; and upon the trial, Mr. Key, for the United States, asked Peach, the witness, to produce the two phials of wash or eye-water which the defendant had prescribed for the eyes of his daughter. But the witness objected that he had made a solemn promise to the defendant not to suffer the wash to be examined.

Mr. Brent, for the defendant, cited Starkie, Cr. Pl. 73.

THE COURT (MORSELL, Circuit Judge, contra), refused to compel the witness to produce the wash, considering the ingredients as immaterial, this not being a prosecution for fraud or malpractice; and THRUSTON, Circuit Judge, said the defendant had a right to his secret.

Mr. Key then offered evidence of a specific instance of practice and receiving payment, not stated in the indictment, and of which no notice had been given, and contended that as all the instances of practice before the finding of the indictment constitute but one offence, he had a right to give in evidence any specific instance upon the general count, without notice.

But THE COURT (MORSELL, Circuit Judge, contra), rejected the evidence.

By the act of congress of February 16, 1819 (6 Stat. 221), entitled "An act to incorporate the Medical Society of the District of Columbia" (section 1), certain physicians therein named, "and such persons as they may, from time to time, elect, as their successors," are declared to be a corporation, by the name of "The Medical Society of the District of Columbia," and may hold property, not exceeding $6,000, and apply the same "to such purposes as they may judge most conducive to the promoting and disseminating medical and surgical knowledge." By the second section they are to hold four stated meetings every year, namely, on the first Mondays in January, April, July, and October. The officers are to consist of a president, two vice-presidents, one corresponding and one recording secretary, one treasurer, and one librarian, "to be appointed on the second Monday of March, 1819, and on the annual meeting in January forever thereafter, (not less than seven members being present at such meeting.)" By the third section it is enacted, "that it shall and may be lawful for the said medical society, or any number of them attending (not less than seven), to elect by ballot five persons, residents of the district, who shall be styled 'The Medical Board of Examiners of the District of Columbia,' whose duty it shall be to grant licenses to such medical and chirurgical gentlemen as they may, upon a full examination, judge adequate to commence the practice of the medical and chirurgical arts, or as may produce diplomas from some respectable college or society." And by the fifth section it is enacted, "that after the appointment of the aforesaid medical board, no person, not heretofore a practitioner of medicine or surgery within the District of Columbia, shall be allowed to practice within said district, in either of the said branches, and receive payment for his services, without first having obtained a license, testified as by this law directed, or without the production of a diploma as aforesaid, under the penalty of fifty dollars for each offence, to be recovered in the county court where he may reside, by bill of presentment and indictment; one half for the use of the society, and the other for that of the informer."

THE COURT was of opinion that the giving of advice and the application of external remedies to the eyes was not the practice of the medical, but rather of the chirurgical art, and if it was an offence at all should have been so charged in the indictments.

Verdict, not guilty, on these indictments.

The grand jury then brought in a new indictment, containing four counts: (1) The first count charged that the defendant, not having been a practitioner of medicine or surgery within the District of Columbia before the 16th day of February, 1819, did, on the 15th of December, 1836, practise, within the county and district aforesaid, in the medical art, and receive payment for his services therefor, without first having obtained a license, &c., against the form of the statute, &c. (2) The second count was like the first, except that it charged him with practising in the chirurgical art. (3) The third charged him with practising in the medical art, and receiving payment for his services therefor, namely, fifty dollars from John Mitchell, fifty dollars from Joseph S. Wilson, and fifty dollars from Samuel Peach. (4) The fourth was like the third, except that the charge was for practising in the chirurgical art. At the bottom of the indictment was this notice: "Bill of Particulars. Under this indictment the United States attorney will offer evidence of the traverser's practising in the medical art, and in the chirurgical art, and receiving money therefor from the following persons: John Mitchell, $50, Samuel Peach, $50, Joseph S. Wilson, $50, Samuel Carr, $50. F. S. Key, United States Attorney."

Upon the trial upon this indictment, Mr.

Brent and Mr. Hoban, for defendant, contended that the act only required a license to practice the whole medical art, or the whole surgical art, and did not apply to those who practised only in particular diseases, or in respect of particular organs, such as aurists, dentists, oculists, cuppers, bleeders, &c. The branches mentioned in the statute are not branches of the medical art, or branches of the chirurgical art, but the whole medical art is one branch, and the whole surgical art is the other, of the two great branches into which the ars medicatrix is divided; the one using internal medicines, the other external applications.

F. S. Key and John R. Key, for the United States. The statute intended to prevent the practice of any branch either of the medical or the surgical art, by unskilful and unlearned men, whether they pretended to practise for particular diseases, or particular organs, as general physicians or surgeons.

THE COURT (THRUSTON, Circuit Judge, contra) was of opinion that the statute was applicable to every branch of medicine and surgery.

Mr. Brent, for the defendant, having contended that the charter of the medical society had been surrendered, or abandoned, and the society dissolved, obtained a rule to show cause why an information in the nature of a writ of quo warranto should not be filed to try the question, and it was agreed that it should be heard as part of the present case.

The counsel for the United States contended that such an information cannot be issued at the suit of an individual alone. 2 Kent, Comm. 313; Ang. & A. Corp. 473; Com. v. Union Fire & Marine Ins. Co. in Newburyport, 5 Mass. 230; Wallace v. Anderson, 5 Wheat. [18 U. S.] 291; Ang. & A. Corp. 76, 77, 470. The government may waive the forfeiture. And a judgment of forfeiture now entered would not relate back to the time of the defendant's practice.

Mr. Brent, Jr., admitted that on the ground of abuse there can be no quo warranto without leave of the government, but for non-user there may. There is a difference between declaring a forfeiture of the charter and the non-existence of the corporation. They do not pray the court to dissolve the charter, but to declare it dissolved. They cannot kill the corporation without a quo warranto, but may show it to be dead, and a surrender may be presumed from the non-user. Slee v. Bloom, 19 Johns. 456.

John R. Key, in reply. A mis-user, or non-user, does not destroy the charter.

THE COURT (MORSELL, Circuit Judge, contra) refused to permit the information to be filed; but decided (CRANCH, Chief Judge, contra) that it is competent for the defendant to show in this trial that the charter was vacated.

The grand jury having, during the trial, brought in two more indictments against the defendant, the petit jury was, by consent, sworn upon them also. One of them contained five counts, all charging the defendant with fraud, in obtaining money by false pretences.

1. The first charged that the defendant, being an evil-disposed person and common cheat, did fraudulently personate a certain John Williams, who had been known and esteemed as a doctor of medicine and oculist, and who had deservedly acquired great reputation for his learning and skill, intending to deceive and defraud the good people of the United States, in the county of Washington, in the District of Columbia, and more particularly one Samuel Peach, of his moneys, and by such false pretence, unlawfully, knowingly, and deceitfully obtained from him a large sum of money, to wit, the sum of fifty dollars, with intent to cheat and defraud, and did then and there cheat and defraud the said Samuel Peach of the same, &c.

2. The second count charged that the defendant, being an evil-disposed person and a common cheat, as aforesaid, and contriving and intending unlawfully, fraudulently, and deceitfully to cheat and defraud a certain Samuel Peach of his moneys, did knowingly, fraudulently, and falsely pretend to the said Samuel Peach that he, the said John Williams, (the defendant,) was a doctor of medicine and an oculist, whereas in truth and in fact the said John Williams was not then a doctor of medicine, and was not an oculist, as he did then and there so falsely pretend to the said Samuel Peach; by which false pretences he then and there unlawfully, knowingly, and deceitfully obtained from the said Samuel Peach a large sum of money, to wit, the sum of fifty dollars, with intent then and there to cheat and defraud, and did, then and there, thereby cheat and defraud the said Samuel Peach of the same.

3. The third count charged that the defendant, being an evil-disposed person and common cheat, with intent, &c., as aforesaid, did knowingly, fraudulently, and falsely pretend to the said Samuel Peach that he, the defendant, was a person well skilled in curing the diseases of the eyes, and that he could cure the disease then existing in the eyes of Mary Ellen Peach, daughter of the said Samuel Peach; whereas in truth and in fact the said John Williams was not a person well skilled, &c., and could not cure the disease then existing in the eyes of the said Mary Ellen, as he so falsely pretended; by which false pretences last aforesaid the defendant did unlawfully, &c. obtain from the said Samuel Peach a large sum of money, to wit, the sum of fifty dollars, with intent then and there to cheat and defraud, and did then and there cheat and defraud the said Samuel Peach of the same.

4. The fourth count was for cheating the said Samuel Peach of fifty dollars, by pre-

tending to give advice and medicine that would cure the disease of his daughter's eyes, whereas, &c.

5. The fifth count was for cheating Peach of fifty dollars, under the false pretence that the defendant was an oculist, and was competent to give, and for fifty dollars to be advanced, would give advice and medicines fit and proper to be administered to cure the disease of his daughter's eyes, and by such false pretence prevailed on Peach to pay him the sum of fifty dollars; whereas in truth and in fact he was not an oculist, and was not competent to give and did not give such advice and medicines; but the advice and medicines which he did give were unfit and improper, &c.

The other new indictment brought in by the grand jury charged that the defendant publicly and falsely pretended that he was an oculist, and offered himself to the good people of the United States in the county of Washington, to be consulted and employed in diseases of the eyes, and was by great numbers of people so consulted and employed; and did offer and sell to divers, to wit, fifty of the said good people, for large sums of money, for his own wicked gain, unlawfully, fraudulently, and deceitfully, certain prescriptions and medicines, falsely pretended by him to be remedies for certain diseases of the eyes, with which the said persons were then and there afflicted, as good and proper remedies for the said diseases, and did so offer and sell and deliver, among others, to Samuel Peach, John Mitchell, Samuel Carr, and Joseph S. Wilson, the said pretended prescriptions and medicines as good and proper remedies, &c., whereas in truth and in fact the said prescriptions and medicines were not good and proper, &c., but unfit and improper, &c., and were well known to the said John Williams not to be good and proper, &c., but unfit and improper; by means of which said false pretences the said good people so consulting and employing the said John Williams, and the said persons so hereinbefore named as aforesaid, were cheated and defrauded of large sums of money, &c.

Mr. Key, for the United States, produced a release by the medical society to Rowland, the informer, of all the society's interest in the penalty; and then offered to examine as a witness, Doct. Sewall, one of the members of the society.

THE COURT (nem. con.) was of opinion that Doct. Sewall was a competent witness in the trial of the issue upon the two last indictments, but not in the prosecution for practising without a license, inasmuch as the court (CRANCH, Chief Judge, dissenting) had decided that it was competent for the defendant to show, in his defence, that the charter was vacated by the non-user.

R. J. Brent, for the defendant, prayed the court to instruct the jury, that if they should believe from the evidence that the board of examiners, acting at the time of the alleged offence. was not elected upon the first Monday or January, 1836; or if, for the last several years the said board has been annually elected, and not constituted by filling vacancies in the same from time to time. as they occurred; or if the times and places for the meeting of the said acting board, were not fixed by the said supposed society, or if the acting president, secretary, and treasurer, or either of them, were not elected upon the first Monday of January, 1836, then the said board of examiners were not authorized (de jure) by law to grant licenses, and the traverser is entitled to a verdict of acquittal. And also, if the jury should find from the evidence, that the officers of the supposed medical society, were not elected by seven members present on the first Monday of January, 1836, as directed by the charter, the said medical society was not in operation, and the defendant is entitled to a verdict of acquittal. And also, if the jury believe from the evidence that from the date of the charter up to the year 1834, there was no medical board elected by at least seven members of the said society, then the right to elect the said medical board, no longer existed in law, and all subsequent elections of said board were illegal and void; and, by consequence, could not authorize them to grant licenses, and the defendant is therefore entitled to a verdict. And also, if the jury believe from the evidence that the election of the different officers of the medical society was not made by at least seven members present, as directed by the charter, on the second Monday of March. 1819, and on the annual meeting in January, from that time to the first Monday of January, 1836, inclusive, then the defendant is entitled to a verdict of acquittal. also, if the jury believe that a resolution was passed by the said supposed society, to pay the debts of the said society, and to divide the funds; and that a division of said funds actually took place, and that for several years there were no operations whatsoever of the said society; and that members of the said society declared they had abandoned it, and considered it dissolved, then the jury may presume a surrender of the said charter, and the defendant is entitled to a verdict of acquittal.

Mr. Brent contended that by the neglect to choose its officers annually, the society is extinct de jure. 2 Kent, Comm. 295. The Case of the Corporation of Banbury, 10 Mod. 346; Rex v. Pasmore, 3 Term R. 238; St. 11 Geo. I. c. 4. The old officers could not hold over after the year. If it were a principle of the common law that they could, the statute of 11 Geo. I. c. 4, would not have been necessary. State v. Wayman, 2 Gill & J. 278; Philips v. Wickham, 1 Paige, 590, confirms 10 Mod. 346; Rex v. Mayor & Burgesses of Tregenny. 8 Mod. 127. That there was no board of examiners de jure.

The board was not, by the charter, to be chosen annually, but to be kept alive by filling vacancies as often as they should occur. See the 7th section of the charter. See, also, Foot v. Prowse, 1 Strange, 625; Hall v. Gough, 1 Har. & J. 122; Bank of Michigan v. Williams, 5 Wend. 478; Rex v. Hughes, 4 Barn. & C. 368, 377, 378; Symmers v. Regem, Cowp. 507; Rex v. Mein, 3 Term R. 598; Rex v. Hebden, 2 Strange, 1109; S. C. Andrews, 388; Rex v. Grimes, 5 Burrows, 2601; Rex v. Peacock, 4 Term R. 686, per Ashhurst, J.; Anon., 1 Barnard, 345; and Ang. & A. Corp. 76, 77. That it was incumbent on the society to fix the times and places for the meetings of the board of examiners, and to fill up vacancies in the board. That there is no evidence of a user of the corporate rights until 1834; no minutes of their proceedings; no lawful president to sign the licences; no notice of meetings; but there is evidence of their breach of trust in dividing among the individual members the corporate funds, which by the charter they were to apply exclusively to the promotion of medical and surgical knowledge. They are bound to show their authority, and must be strictly confined to their charter. 2 Kent, Comm. 299.

John R. Key, contra. Now, user or misuser is not a dissolution of the corporation. It can only be dissolved by a proceeding against the corporation itself. 2 Kent, Comm. 312; 1 Bl. Comm. 485; Bac. Abr. "Corp." 3. Even a forfeiture is not a dissolution until a judgment is pronounced, and all its acts, up to that time are valid. And the judgment must be upon a scire facias, or a quo warranto. The dissolution of a corporation can not be inquired into and ascertained collaterally in a suit against others. U. S. v. Amedy, 10 Wheat. [23 U. S.] 392; Bac. Abr. "Corp." F. or G.

THRUSTON, Circuit Judge, and MORSELL, Circuit Judge, being of opinion against Mr. Key on that point, he said he would abandon it. But he contended that the corporation was, in fact, still in existence de jure and de facto, until a judgment against it. 2 Kent, Comm. 310; Slee v. Bloom, 19 Johns. 456; Rockville Turnpike Co. v. Van Ness [Case No. 11,986], in this court; Mechanics' Bank v. Minor [Id. 9,385], also in this court. As to annual election of officers, Mr. Key cited 2 Kent, Comm. 295.

THE COURT neither refused nor granted the instructions prayed by Mr. Brent, but (CRANCH, Chief Judge, contra) instructed the jury, that if they should be of opinion from the evidence, that at the time when, &c., there was no board of examiners de jure, the defendant is not guilty under the statute, and that if they should be satisfied by the evidence, that the board was not elected and continued by filling up vacancies, &c., but was, for the last two or three years, elected annually, &c., then there was no legal board of examiners, &c.

MORSELL, Circuit Judge, expressed an opinion that the prosecution was not sustained. That the indictment ought to have averred that there was such a corporation; that the board of examiners was appointed by at least seven of the members; and that the United States must show that the officers were duly appointed; and that although the minutes of the proceedings of the board were lost, yet the United States must prove their contents; and must show that, at the time when, &c., there was a competent board of examiners de jure. And that "if the jury find from the evidence that the election of the board of examiners was by a less number than seven members of said association; that then there was a neglect to elect an integral part of said corporation, and that it was thereby entirely incapable of performing the principal purpose for which the charter was granted, that they could not so restore their power as to make any subsequent legal election of said board of examiners; and that even if it amounts not to a forfeiture, yet by a consequence of law, said corporation is dead; and that if such was the state of this (society) at the time of the offence committed, as charged in the indictment, then they ought to find the traverser not guilty." He said also that he was willing to give the jury the following instruction: "If the jury believe from the evidence that the medical association omitted intentionally to elect the president, vice-president, secretary, and treasurer of the said society for several years after the organization of the society, at the times directed by the charter, and neglected to fill up the vacancies which occurred in the said medical board; and that one or more of the members of the said association withdrew themselves therefrom, declaring that they considered the said corporation as dissolved; and, further, that the said association determined, by resolve of the board, to divide the property and effects of the said society among the individual members thereof; that then the jury may find that there was a surrender of the corporate franchises and privileges of said society, and that the said corporation was dissolved. And if the aforegoing state of things existed, at the time charged in the said indictments when the offence was committed, they ought to find the traverser not guilty."

In this opinion, THRUSTON, Circuit Judge, seemed to acquiesce, and added that in his opinion the society, by its charter, was only authorized to license students, and those who were about to commence the practice, not those already in the practice.

In consequence of this opinion of the court, Mr. John R. Key, in opening his argument to the jury upon the evidence, said he should abandon the prosecution for practising with-

out license, but not on the ground of defect of evidence. The jury after being out two days and one night, returned with a verdict of acquittal upon all the indictments.